UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION

| | |
|---|---|
| ROBERT PETERSON, an individual, and HAD TO HAVE IT, LLC, a Delaware limited liability company, <br><br>　　　　　　Plaintiffs,<br><br>　　v.<br><br>HATTERAS/CABO YACHTS, LLC, a Delaware limited liability company,<br><br>　　　　　　Defendant. | Case No. 4:18-CV-00158<br><br>**JURY TRIAL DEMANDED** |

# COMPLAINT

Plaintiffs, Robert Peterson ("Mr. Peterson") and Had To Have It, LLC ("HTHI"), by and through their undersigned counsel, sues Defendant Hatteras/Cabo Yachts, LLC ("Hatteras") and alleges the following:

1. Mr. Peterson paid Hatteras $5.4 million to purchase what he anticipated would be a well-made and high quality recreational and sport fishing yacht. Instead, the yacht Hatteras designed, manufactured and delivered to Mr. Peterson was so thoroughly riddled with defects and problems that Mr. Peterson has spent over three years repeatedly trying to get Hatteras to repair the defective yacht so that it performs in a safe, seaworthy manner consistent with Hatteras's obligations and promises. After Hatteras failed for years to repair the yacht, Hatteras subsequently crashed it while testing it at sea, causing significant damage to the hull and further making it unseaworthy and unsafe. Mr. Peterson and HTHI seek to recover damages arising out of Hatteras's breach of contract, breach of express and implied warranties, and negligence in design, manufacture, repair, and operation of the yacht.

## PARTIES

2. Robert Peterson is an individual who is a citizen of Texas. Mr. Peterson is an avid boat enthusiast who enjoys recreational fishing.

3. Had To Have It, LLC is a Delaware limited liability company. HTHI's sole member, Plaintiff Robert Peterson, resides in Texas. HTHI holds legal title to the yacht that is the subject of this dispute.

4. Hatteras/Cabo Yachts, LLC is a Delaware limited liability company with its principal place of business located at 110 N. Glenburnie Road, New Bern, Craven County, North Carolina 28560. Hatteras is a wholly owned division of Versa Capital Management, LLC, a Delaware limited liability company, and upon information and belief, none of the members of Versa Capital Management, LLC reside in Texas. Hatteras is engaged in the business of designing, engineering, and manufacturing luxury motor yachts and sports fishing convertibles utilizing fiberglass construction.

## JURISDICTION AND VENUE

5. The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 2310(d)(1) because this action arises under the Magnuson-Moss Warranty Act and the amount in controversy exceeds $75,000, exclusive of interest and cost.

6. The Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because complete diversity of citizenship exists between the Plaintiffs and the Defendant, and the amount in controversy exceeds $75,000, exclusive of interest and cost.

7. In addition, the Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367 because the state law claims are so related to the Magnuson-Moss Warranty Act claim that they form part of the same case or controversy.

8. The Court has personal jurisdiction over Hatteras because it owns and operates a business in the State of North Carolina, and because the facts giving rise to this Complaint occurred in the State of North Carolina.

9. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Hatteras maintains its principal place of business in New Bern, North Carolina, which lies in the Eastern District of North Carolina.

10. Venue is also proper in this Court pursuant to Section 15 of the Agreement, which provides that "[a]ny action arising out of this Agreement may be brought only in a state or federal court sitting in North Carolina."

11. Mr. Peterson and HTHI have retained the undersigned law firms and have agreed to pay them a reasonable fee for their services.

## GENERAL ALLEGATIONS

12. Hatteras is engaged in the business of manufacturing and selling "luxury" motor and sportfish yachts that "stand as the benchmark of quality and innovation." In its promotional materials, Hatteras proclaims that its yachts are "engineered to excel in higher seas at higher speeds" and that "[t]heir perfect balance of weight, speed and hull design deliver a smooth ride that can only be defined as pure Hatteras."

13. Beginning in the summer of 2014, Mr. Peterson and Hatteras commenced negotiations for the purchase and sale of a 2015 Model Year Hatteras GT70, a sportfish convertible yacht. During the negotiations, Mr. Peterson explained that he required a yacht that could travel at speeds in excess of 42 knots and a yacht fit for long distance travel, and discussed in detail with Hatteras the safety systems, performance requirements, and workmanship he desired for the yacht. Hatteras then created plans and specifications to satisfy Mr. Peterson's

3

AMERICAS 95226110

Case 4:18-cv-00158-D   Document 1   Filed 09/12/18   Page 3 of 19

goals, and agreed to construct a high quality yacht in accordance with those goals, as well as any change orders Mr. Peterson submitted to Hatteras prior to completion of the yacht.

14. On or about October 31, 2014, in reliance on the plans and specifications prepared by Hatteras, as well as Hatteras's representations, Mr. Peterson entered into a Purchase Agreement (the "Agreement") with Hatteras to purchase a 2015 Model Year Hatteras GT70 (the "yacht") for a total of $5,400,000. A copy of the Agreement is attached as **Exhibit 1** to this Complaint.

15. At the close of the sale, Hatteras provided Mr. Peterson with its Express Limited Warranty, in which it warranted that it would repair or replace certain parts that are defective in material and workmanship if the defect is reported within two years from the date of sale. Hatteras also warranted that it would repair any structural fiberglass hull defect and defects that result in osmosis blistering of the gel coat surface of the hull if the defect is reported within ten years from the date of sale. A copy of the Hatteras Express Limited Warranty (the "Limited Warranty") is attached as **Exhibit 2** to this Complaint.

16. The yacht was subsequently named "Had to Have It" and Mr. Peterson transferred title to the yacht to HTHI.

17. On May 4, 2015, Mr. Peterson then took delivery of the yacht.

18. As Mr. Peterson took his maiden voyage with the yacht, out of Hatteras's facility in New Bern, North Carolina, he discovered a problem with the engine that triggered certain error codes. The error codes, as well as the other defects noted below, clearly indicate that Hatteras acted unreasonably in designing and constructing the yacht or unreasonably failed to adopt a reasonable design. Mr. Peterson immediately reported the defect to Hatteras and

4

AMERICAS 95226110

Case 4:18-cv-00158-D   Document 1   Filed 09/12/18   Page 4 of 19

expected Hatteras to fix the defect within a reasonable amount of time, without any impact on his ability to use and enjoy the yacht.

19. Unfortunately, this expectation was not met and the engine was not the only defect Mr. Peterson discovered on the yacht. From June 2015 until June 2018, several other defects in material and workmanship were discovered, including, but not limited to, problems with the trim tab system, electrical system, engine, transmission, and propellers. The yacht also had leaks, cracks, stains, and blistering paint in several areas. These defects materially and negatively affected the yacht's safety, speed, electric power distribution, performance, and appearance.

20. For more than three (3) years, Mr. Peterson timely reported all defects to Hatteras within two years of the date of sale and gave Hatteras a reasonable amount of time to complete the necessary repairs. As explained further below, several of the defects remain even after multiple attempts by Hatteras to repair them.

**A. <u>Defects in Material & Workmanship</u>**

21. Hatteras failed to build a fully functional and workable yacht that conformed to Mr. Peterson's requirements and the plans and specifications in the Agreement.

22. Since taking delivery of the yacht on May 4, 2015, Mr. Peterson discovered that the yacht had several defects in material and workmanship, including, but not limited to:

   a. the engine, which limit the ability of the engine to reach 2,450 revolutions per minute ("rpms") and the yacht to reach speeds in excess of 42 knots;

   b. the transmission system;

   c. the propellers, causing a noticeable vibration throughout the yacht;

   d. the trim tab system, making it impossible to evenly distribute weight on the yacht and keep the yacht on an even plane;

   e. the electrical system, which causes frequent power outages and triggers several alarms on the yacht; and

  f. defects in appliances and other parts of the yacht causing leaks and cracking paint.

  23. While Hatteras corrected the defects in the trim tab system and electrical system, the other material defects remain.

  24. For example, the speed performance of the yacht has significantly declined since Mr. Peterson took delivery. Beginning in August 2015, Mr. Peterson discovered that the yacht could not reach its top-speed of over 42 knots and the engine could not reach 2,450 rpms. In fact, each time Mr. Peterson attempted to reach top-speed, he set off several alarms on the yacht, triggering a derating of the engines. Mr. Peterson purchased the yacht primarily for its ability to reach top-speed of 42 knots and the yacht fails to reach that level of performance.

  25. The transmission and propellers on the yacht are also materially defective. The transmission system is noisy and the propellers cause vibrations to reverberate throughout the yacht, including, but not limited to, in the steering wheel, helm seats, and electronics boxes.

  26. Furthermore, there are several leaks on the yacht and several areas in need of paint repairs. For example, there are leaks in the transmission, engine, steering pressure system, pumps, and in various areas of the engine room. In addition, there are many areas of blistering paint and appliances in and around the yacht.

  27. Each time Mr. Peterson discovered a defect, he reported the defect to Hatteras and provided work lists, photographic documentation, possible solutions, written estimates and made the yacht available for repair. The repair process has been costly for Mr. Peterson, who incurred significant out-of-pocket expenses in connection with repairing the defects on the yacht, including fuel costs and payments to third-party servicers.

  28. Indeed, in order to complete a number of the repairs, Mr. Peterson brought the yacht from Fort Lauderdale, Florida, where the yacht is docked, to New Bern, North Carolina, where Hatteras's facility is located. Fuel costs for a one-way trip between Fort Lauderdale and

6

New Bern ranges from $20,000 to $25,000. Other costs were incurred during sea trials, which is the required testing phase that takes place on open water after the repair of a yacht.

29. In addition to the repair process being a costly process, it has been time-consuming process, which required Mr. Peterson to send Hatteras hundreds of emails and call Hatteras on a daily or weekly basis to report the problems and make arrangements for Hatteras to attempt repairs.

30. The yacht has been plagued with problems nearly the entire time Mr. Peterson has owned the yacht, taking away from Mr. Peterson's personal time as he participated in meetings and calls about the defects of the yacht and flew to Hatteras's facility in New Bern to oversee repairs. In fact, Mr. Peterson had no choice but to seek assistance from his employee, Captain Ken Dromgoole, because the time spent communicating with Hatteras about the problems with the yacht became a second job.

31. Despite all of Mr. Peterson's efforts, Hatteras failed to fix the defects within a reasonable amount of time and the defects remain after *three years* of notifying Hatteras about the problems, **19** months of repairs, and approximately **40** sea trials totaling 150 hours.

**B. Hatteras Crashes the Yacht**

32. On top of the numerous defects and problems with the yacht, Hatteras significantly damaged the yacht when Hatteras crashed the yacht into a mud bar during a sea trial near New Bern, North Carolina.

33. In September 2017, Hatteras again received the yacht for repairs at its facility in New Bern, North Carolina and the yacht remained in Hatteras's possession for several months, depriving Mr. Peterson of the use and enjoyment of the yacht.

7

34. On January 22, 2018, Captain Greg Brownell and Matt Saloom, both of whom were employees of Hatteras, set out with Captain Dromgoole from the Hatteras facility in New Bern, North Carolina to conduct an engine sea trial of the yacht.

35. Captain Brownell was operating the yacht during the sea trial. On the return trip to the Hatteras facility, Captain Brownell crashed the yacht into a mud bar in the Adams Creek section of the Intracoastal Waterway, causing significant damage to the yacht and rendering the hull unfit and unsafe for use under normal operating conditions.

36. After the crash, Captain Dromgoole took control of the yacht and reversed the yacht out of the mud bar only to discover that the transmissions were stuck in gear and unresponsive to control input. Captain Dromgoole then shut down the main engines, anchored the vessel, and requested towing assistance.

37. The yacht was towed to Hatteras's New Bern facility for repairs.

38. Days after the crash, Huffman Marine Surveys conducted a damage survey of the yacht to ascertain the cause, nature, extent, and recommended repair of damages caused by the crash. In February 2018, the surveyor issued a comprehensive report detailing numerous problems with the yacht, including, but not limited to:

    a. coatings cracked on the port side, amidships;

    b. grout seam cracked between stone counter top and backsplash in forward head;

    c. port and starboard transmissions stuck in gear;

    d. damage to the propellers, shafts and rudders, leading to vibrations reverberating through the yacht;

    e. bottom paint and fairings cracked at the strut and strut coatings; and

    f. coatings missing on keel.

39. Mr. Peterson has allowed Hatteras a reasonable amount of time, of at least six months, to attempt to fix the damage from the crash. But despite Hatteras's attempts to repair the yacht, the hull remains compromised.

40. Indeed, on August 8-9, 2018, after Hatteras's repairs, Offshore Marine Inspections conducted a visual inspection and thermal infrared inspection of the yacht and found several problems with the hull.

41. During the visual inspection of the starboard and port hull, Offshore Marine Inspections found that the mask of the yacht had multiple tone and pitch differences when sounded and that there were areas of outer layer laminate delamination and/or disbanding noted in:

    a. Port amidships hull side;

    b. Starboard amidships and forward hull side;

    c. Centreline of transom at and below the zinc anode; and

    d. Starboard fore deck at the Bomar hatch;

42. In addition, with respect to the port hull of the yacht, Offshore Marine Inspections found: (i) numerous areas of the port hull that were suspect for voids; (ii) areas in the hull sides that were suspect for delamination and/or disbanding; (iii) areas in the hull sides where the kerfs of the core material are visible; and (iv) imperfections in the repair of the strut assembly.

43. With respect to the starboard hull of the yacht, Offshore Marine Inspections, found: (i) areas in the hull bottom that were suspect for voids; (ii) areas in the exhaust tube that were suspect for delamination and/or disbanding; and (iii) areas in the hull sides where the kerfs of the core material are visible.

9

AMERICAS 95226110

Case 4:18-cv-00158-D   Document 1   Filed 09/12/18   Page 9 of 19

44. Mr. Peterson has lost faith in and sustained a significant diminution in value of the yacht due to the number of defects, the multiple repairs and the existing damage to the hull of the yacht.

45. All conditions precedent to Mr. Peterson's and HTHI's recovery have occurred, have been performed, or have been waived.

## COUNT I – BREACH OF CONTRACT

46. Mr. Peterson and HTHI incorporate and reallege paragraphs 1 through 45 as if fully set forth herein.

47. Mr. Peterson and Hatteras entered into a binding and valid contract requiring Hatteras to construct the yacht in conformity with the plans, specifications, and terms set forth in the Agreement, the exhibits and attachments to the Agreement, and change orders referenced in the Agreement.

48. Hatteras breached the terms of the Agreement by defaulting in the performance of its obligations under the Agreement and failing to cure the deficiencies in its performance within 30 days after receiving notice from Mr. Peterson of the deficiencies pursuant to Section 13 of the Agreement.

49. Mr. Peterson fully performed all of his obligations under the Agreement.

50. As a direct and proximate result of Hatteras's breaches of the Agreement, Mr. Peterson and HTHI have suffered and will continue to suffer damages that include, without limitation, diminution in value, expenses due to negligent workmanship in manufacturing and repair, and loss of use and enjoyment of the yacht.

WHEREFORE, Mr. Peterson and HTHI seek damages, including but not limited to, actual, incidental and consequential damages, equitable remedies, including, but not limited to,

10

AMERICAS 95226110

Case 4:18-cv-00158-D   Document 1   Filed 09/12/18   Page 10 of 19

revocation of acceptance and rescission of contract, as well as interest, attorneys' fees and costs and such other and further relief as the Court may deem just and proper.

## COUNT II – NEGLIGENCE IN DESIGN
## (N.C.G.S. § 99B-6)

51. Mr. Peterson and HTHI incorporate and reallege paragraphs 1 through 45 as if fully set forth herein.

52. Beginning in May 2015, Mr. Peterson notified Hatteras of several defects in design and manufacture that negatively affected Plaintiffs' use and enjoyment of the yacht.

53. The yacht was in a defective condition and unreasonably dangerous to Mr. Peterson when it left Hatteras's possession or control in that, under normal conditions, usage and applications, the yacht had an unreasonably high tendency for failure.

54. Hatteras knew, or should have known, that the ordinary and foreseeable use of the yacht included ocean sport fishing and long-distance travel.

55. Hatteras knew, or should have known that the yacht, as designed, manufactured, produced, tested, inspected, marketed, and/or sold for ordinary and foreseeable use would fail to perform as intended.

56. Hatteras had a duty to design and manufacture a yacht that was fit for Mr. Peterson's ordinary and foreseeable use, as well as a duty to use reasonable care in designing the yacht.

57. Hatteras failed to exercise reasonable care with respect to the design, development, manufacture, production, testing, inspection, marketing and sale of the yacht by failing to design and manufacture the yacht in a manner to ensure that under normal usage, conditions and applications the yacht would perform as intended and represented.

58. Hatteras's negligence as set forth herein directly and proximately caused the damages to HTHI and Mr. Peterson, who would not have purchased the yacht with said serious defects had Hatteras discharged its duties.

59. As a direct and proximate result of Hatteras's negligence, Mr. Peterson and HTHI have suffered and will continue to suffer damages that include, without limitation, diminution in value, expenses due to negligent workmanship in manufacturing and repair, and loss of use and enjoyment of the yacht.

WHEREFORE, Mr. Peterson and HTHI seek damages, including, but not limited to, actual, incidental and consequential damages, as well as interest, attorneys' fees and costs and such other and further relief as the Court may deem just and proper.

## COUNT III – NEGLIGENCE IN MANUFACTURE

60. Mr. Peterson and HTHI incorporate and reallege paragraphs 1 through 45 as if fully set forth herein.

61. Beginning in May 2015, Mr. Peterson notified Hatteras of several defects in design and workmanship that negatively affected Mr. Peterson's use and enjoyment of the yacht.

62. The yacht was in a defective condition and unreasonably dangerous to Mr. Peterson when it left Hatteras's possession or control in that, under normal conditions, usage and applications, the yacht had an unreasonably high tendency for failure.

63. Hatteras knew, or should have known, that the ordinary and foreseeable use of the yacht included ocean sport fishing and long-distance travel.

64. Hatteras knew, or should have known that the yacht, as designed, manufactured, produced, tested, inspected, marketed, and/or sold for ordinary and foreseeable use would fail to perform as intended.

65. Hatteras had a duty to design and manufacture a yacht that was fit for Mr. Peterson's ordinary and foreseeable use, as well as a duty to use reasonable care in manufacturing the yacht.

66. Hatteras failed to exercise reasonable care with respect to the design, development, manufacture, production, testing, inspection, marketing and sale of the yacht by failing to design and manufacture the yacht in a manner to ensure that under normal usage, conditions and applications the yacht would perform as intended and represented.

67. Hatteras's negligence as set forth herein directly and proximately caused the damages to HTHI and Mr. Peterson, who would not have purchased the yacht with said serious defects had Hatteras discharged its duties.

68. As a direct and proximate result of Hatteras's negligence, Mr. Peterson and HTHI have suffered and will continue to suffer damages that include, without limitation, diminution in value, expenses due to negligent workmanship in manufacturing and repair, and loss of use and enjoyment of the yacht.

WHEREFORE, Mr. Peterson and HTHI seek damages, including, but not limited to, actual, incidental and consequential damages, as well as interest, attorneys' fees and costs and such other and further relief as the Court may deem just and proper.

## COUNT IV- NEGLIGENCE IN REPAIRS

69. Mr. Peterson and HTHI incorporate and reallege paragraphs 1 through 45 as if fully set forth herein.

70. In September 2017, Hatteras received the yacht at its facility in New Bern, North Carolina in order to conduct repairs on the numerous defects in material and workmanship and had the yacht in its possession until May 2018.

13

71. On January 22, 2018, Hatteras crashed the yacht into a mud bar during an engine sea trial, causing significant damage to the hull of the yacht.

72. Hatteras had a duty to perform its work on the yacht and its subsequent tests of the yacht with that degree of diligence, attention and skill adequate to complete the task of making repairs to the yacht.

73. Hatteras breached its duty to Mr. Peterson and HTHI by failing to use reasonable care to properly supervise or instruct its agents and employees to ensure the repairs were made in a competent manner, the tests were conducted safely and that the yacht was seaworthy.

74. As a direct and proximate result of Hatteras's negligence, Mr. Peterson and Hatteras have suffered damages and will continue to suffer damages that include, without limitation, diminution in value, expenses due to negligent workmanship in manufacturing and repair, and loss of use and enjoyment of the yacht.

WHEREFORE, Mr. Peterson and HTHI seek damages, including, but not limited to, actual, incidental and consequential damages, as well as interest, attorneys' fees and costs and such other and further relief as the Court may deem just and proper.

## COUNT V - VIOLATION OF MAGNUSON-MOSS WARRANTY ACT
## (15 U.S.C. § 2310)

75. Mr. Peterson and HTHI incorporate and reallege paragraphs 1 through 45 as if fully set forth herein.

76. Mr. Peterson is a "consumer" as defined in the Magnuson-Moss Warranty Act (hereinafter referred to as the "Warranty Act"), 15 U.S.C. § 2301(3).

77. Hatteras is a "supplier" and "warrantor" as defined by the Warranty Act, 15 U.S.C. § 2301(4) and (5).

14

78. The yacht is a "consumer product" as defined in the Warranty Act, 15 U.S.C. § 2301(1).

79. The express warranty given by Hatteras is a "written warranty" as defined in the Warranty Act, 15 U.S.C. § 2301(6).

80. Hatteras expressly warranted that it would repair and replace any defects in material and workmanship.

81. In purchasing the yacht, Mr. Peterson relied on Hatteras's express warranty in purchasing the yacht.

82. Hatteras breached its express warranty by failing to repair and/or replace defective parts of the yacht.

83. As a direct and proximate cause of Hatteras's breach of express warranties, Mr. Peterson and HTHI have and will continue to suffer damages that include, without limitation, diminution in value, expenses due to negligent workmanship in manufacturing and repair, and loss of use and enjoyment of the yacht.

WHEREFORE, Mr. Peterson and HTHI seek damages, including, but not limited to, actual, incidental and consequential damages, as well as interest, attorneys' fees and costs, and such other and further relief as the Court may deem just and proper, including the refund of Mr. Peterson's purchase price in exchange for return of the yacht as provided for under the Warranty Act, 15 U.S.C. § 2310.

## COUNT VI – BREACH OF EXPRESS WARRANTY

84. Mr. Peterson and HTHI incorporate and reallege paragraphs 1 through 45 as if fully set forth herein.

15

AMERICAS 95226110

Case 4:18-cv-00158-D   Document 1   Filed 09/12/18   Page 15 of 19

85. Hatteras expressly warranted that it would repair and replace any defects in material and workmanship.

86. In purchasing the yacht, Mr. Peterson relied on Hatteras's express warranty in purchasing the yacht.

87. Hatteras breached its express warranty by failing to repair and/or replace defective parts of the yacht.

88. As a direct and proximate cause of Hatteras's breach of express warranties, Mr. Peterson and HTHI have and will continue to suffer damages that include, without limitation, diminution in value, expenses due to negligent workmanship in manufacturing and repair, and loss of use and enjoyment of the yacht.

WHEREFORE, Mr. Peterson and HTHI seek damages, including, but not limited to, actual, incidental and consequential damages, as well as interest, attorneys' fees and costs, and such other and further relief as the Court may deem just and proper.

## COUNT VII – BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

89. Mr. Peterson and HTHI incorporate and reallege paragraphs 1 through 45 as if fully set forth herein.

90. Hatteras is engaged in the business of manufacturing motor and sportfish yachts.

91. At all times pertinent hereto, Hatteras was a merchant with respect to sport fishing yachts and impliedly warranted that such goods would be merchantable as defined by N.C.G.S. § 25-2-314.

92. Mr. Peterson used the yacht in a manner and for the purpose for which it was intended and such use was foreseeable by Hatteras. At all times following the purchase of the

yacht, Mr. Peterson has used the yacht in a careful manner, has maintained it as required by Hatteras's operations manuals, and has not misused the yacht in any way.

93. The yacht was in a defective condition and unreasonably dangerous to Mr. Peterson when it left Hatteras's possession or control in that, under normal conditions, usage and applications, the yacht had an unreasonably high tendency for failure.

94. Specifically, at the time the yacht left Hatteras's possession and control, it had serious defects in material and workmanship and was not fit for the ordinary purposes for which it was used, and was unseaworthy.

95. The unseaworthy yacht Hatteras furnished was not fit for the ordinary purposes for which such yacht is used in breach of the implied warranty of merchantability.

96. As a direct and proximate result of the defective condition of the yacht, Mr. Peterson and HTHI have suffered and will suffer damages that include diminution in value, expenses due to negligently made repairs, and loss of use and enjoyment of the yacht.

WHEREFORE, Mr. Peterson and HTHI seek damages, including, but not limited to, actual, incidental and consequential damages, as well as interest, attorneys' fees and costs, and such other and further relief as the Court may deem just and proper.

## COUNT VIII – BREACH OF IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE

97. Mr. Peterson and HTHI incorporate and reallege paragraphs 1 through 45 as if fully set forth herein.

98. Hatteras impliedly warranted that the yacht was fit for ocean sport fishing, the purpose for which it was designed and manufactured, that it was a safe and suitable yacht, and that the yacht was fit and suitable for use by Mr. Peterson.

99. At all times pertinent hereto, Hatteras knew Mr. Peterson's purpose for purchasing the yacht and they knew that Mr. Peterson was relying on Hatteras's skill in selecting suitable goods.

100. In purchasing and using the yacht, Mr. Peterson relied on Hatteras's skill and judgment in selecting a suitable yacht.

101. The yacht is not fit for its particular purpose in violation of N.C.G.S. § 25-2-315 and in breach of the implied warranty of fitness for a particular purpose.

102. As a direct and proximate result of Hatteras's breach of the implied warranty of fitness for a particular purpose, Mr. Peterson and HTHI have suffered and will suffer damages that include diminution in value, expenses due to negligent workmanship in design and manufacture, and loss of use and enjoyment of the yacht.

WHEREFORE, Mr. Peterson and HTHI seek damages, including, but not limited to, actual, incidental and consequential damages, as well as interest, attorneys' fees and costs, and such other and further relief as the Court may deem just and proper.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request judgment in their favor and against Defendant, including the following relief:

A. An award of damages, including, but not limited to, actual, compensatory, incidental and consequential damages, as well as interest;

B. An award of all appropriate equitable remedies, including, but not limited to, revocation of acceptance, rescission of contract, and refund of Mr. Peterson's purchase price in exchange for return of the yacht;

C. An award of attorneys' fees and costs; and

18

AMERICAS 95226110

Case 4:18-cv-00158-D   Document 1   Filed 09/12/18   Page 18 of 19

D. Such other and further relief, at law or in equity, as the Court may deem just and proper.

## JURY DEMAND

Mr. Peterson and HTHI demand a jury trial on all issues so triable.

Dated: September 12, 2018

        Respectfully submitted,

By: s/ Reed J. Hollander
    Reed J. Hollander
    Nelson Mullins Riley & Scarborough LLP
    GlenLake One
    4140 Parklake Avenue Suite 200
    Raleigh, North Carolina 27612
    reed.hollander@nelsonmullins.com
    Telephone: (919) 329-3816
    Facsimile: (919) 329-3149
    North Carolina Bar No. 23405
    Local Civil Rule 83.1(d) Counsel for
    Plaintiffs Robert Peterson and Had To Have
    It, LLC

    James N. Robinson (Florida Bar No. 608858)
    Mahalia A. Cole (Florida Bar No. 98913)
    White & Case LLP
    200 South Biscayne Boulevard
    Miami, Florida 33131-2352
    Telephone: (305) 371-2700
    Facsimile: (305) 358-5744
    E-mail: jrobinson@whitecase.com
    Secondary: mahalia.cole@whitecase.com
    Special Appearance Attorneys for Plaintiffs
    Robert Peterson and Had To Have It, LLC